Good morning. May it please the court. My name is Howard Pincus from the Federal Public Defender and I represent Akuna Ejiofor. The affidavit for the warrant to search Ms. Ejiofor's apartment for evidence of an internet romance scheme did not allege that she took any actions related to the scheme. Instead, the affidavit at best showed that she knew Ken Ejiofor, with whom someone involved in the scheme planned to live, and that she knew somebody else involved in the scheme. The affidavit was so plainly lacking in probable cause that officers could not reasonably rely on the warrant. And as the government has not argued that the admission of the fruits of the illegality were harmless, this court should reverse the suppression order, vacate Ms. Ejiofor's convictions, and remand for a new trial. Although the affidavit contains a lot of detail about the romance scheme, it contains only three facts relating to Ms. Ejiofor. The first involves a connection to Mr. Azea. It is that Mr. Azea sent her $500 on June 15th of 2015 and $200 on June 23rd of 2015. There is no allegation that this was money from the romance scheme. The affidavit says that there was an employment scam that Mr. Azea was conducting at that time, but there's no evidence that it was even connected to that. Was there evidence in this affidavit that would have chronologically shown he received money and then she received money? Was there that kind of a... No, and that's why it was lacking with regard to the employment scheme. Remember, the employment scam is not the internet romance scheme. That's the focus of the affidavit. Mr. Azea received the funds from that scam, which involved the deposit of a check, a counterfeit check, the withdrawal of the funds, and the deposit of it to his account. He received access to those funds on June 22nd of 2015. He had already transferred $500 to her a week earlier. So there's no connection, and the government didn't argue in the district court that there was even a connection to that employment scam. All it said, and all its agents said at the suppression hearing, was that this was another link, that this showed there was a connection between Mr. Azea and Ms. Ejiofor. Which would be true. Yes. She received money from him. And we're not denying that. She knew Mr. Azea, the affidavit can reasonably read to show that, and somebody involved in the scheme was going to live at his house. That's what that evidence so far shows. The second piece of evidence involved the use of a phone involved in the scam, the romance scheme. And the assertion that GPS data showed that it was used during a two-month period in close proximity to both Mr. Azea's house and Ms. Ejiofor's apartment. The affidavit contained no explanation of what was meant by that statement, how often it was used, at what distance it was in, what close proximity meant, or anything of the Those two houses are more than three miles apart. If what the affidavit meant was that the phone was constantly used in, or often used in, close proximity to both residences, a circle with a radius of 1.59 miles, half of the distance between the two houses, would cover almost eight square miles. This is, would link countless homes to the phone. It The third and final fact involved Linda Pohl. The affidavit said that Ms. Pohl appeared to be a legitimate person with a legitimate address. But, I mean, it depends, if you add a comma there, and you compare it with the paragraphs where they actually do find someone's a legitimate person, it appears to me that what it's saying is she's not a legitimate person. If you added a comma, it would change the meaning of that sentence. But that's not what the affidavit said. That's not what was presented to the district judge who signed off on the affidavit, on the warrant. It's not even an argument the government has made. The government just says, this sentence shows. That sentence, grammatically read, says, the agent checked a database which resulted in no information leading him to believe that the address and name associated with Ms. Pohl's iTunes account to be fictitious. That is a statement that they are not fictitious. There's no indication that they are fictitious. The government, in drafting a warrant, a judge, in evaluating an affidavit in support of a warrant, has to be able to rely on what the warrant says, the affidavit says. But can the judge look at how they deal with people in other paragraphs? Like, if you look at the other paragraphs, when they say, we investigated this person, and we determined his address is this, his birth date is this, his social security number is this, it's dealt with very differently. Is it legitimate for the magistrate, the neutral magistrate, to look at the whole warrant affidavit and figure out that there's a comma missing in this one? No, I think the judge has to look at what is actually written in that sentence. If they want to write it in a way that says it appears to be fictitious, it's easy enough to do. That's not what they did. What they did was say it does not, yielded no information leading them to believe it was to be, it was fictitious. What about the, what about the iTunes account and the internet protocol to the address of your client? That sort of ties Linda Pohl and the whole thing together, doesn't it? It shows that Linda Pohl may have been in my client's apartment, yes. And coupled that with the money, coupled that with the money on several occasions? Well, but first we have to look at what her being in the apartment and accessing the internet shows. We have to look at the totality of the circumstances. Of course, of course. And we don't have to prove beyond a reasonable doubt anything. Certainly not. But if we look at what it means that she used her, that Ms. Pohl used the address, that she was in the apartment, there's many reasons why somebody would use an internet connection or a Wi-Fi to download something from iTunes, to buy something from iTunes. It could be convenience. It could be limits of the data plan. Because you can explain other reasons and other possibilities, is that where we go when we're looking at an affidavit in support of a warrant? No, but we also can't rely on hunches and inferences. What we have to do, or speculation, what we have to do is look at what this piece of evidence shows us. And what this piece of evidence shows us is that Ms. Pohl made a legitimate iTunes purchase with Ms. Ejiofor's internet connection. If we take that Linda Pohl is a real person, then it's somebody, it's a legitimate person being in Ms. Ejiofor's apartment. That Ms. Ejiofor knows Linda Pohl. That doesn't tell us anything. And by the way, we also don't know, even if Ms. Pohl is a fictitious person, that that is any link to Ms. Ejiofor. We also have the purchase of flowers with the same card. Correct. The flowers sent to the scam pigeons. The debit card was used to make purchases of flowers in connection with the scheme and an iTunes purchase to Ms. Pohl's account. But it doesn't... Going back to an internet address of Ms. Ejiofor. No, it doesn't show that the flower purchases were made through Ms. Ejiofor's internet address. No, no. The same card was used. Not the same card. And we cleared that up in the reply brief. We had followed the assumption before that it was the same card. In fact, paragraph 25, I believe it is, lists what purchases were made on that debit card. It doesn't show that July 1st iTunes purchase. What we have is the use of Ms. Ejiofor's internet. People use the available internet connection all the time when they have a phone to surf the internet, to make purchases, to do all kinds of things. It shows that Linda Pohl was in Ms. Ejiofor's apartment. It doesn't... And that she made a legitimate, non-fraud related purchase. That shows that Ms. Ejiofor knew Ms. Pohl. Is it important that the purchase was for flowers? And the allegations that we have in the background of this scheme is the purchase of flowers to sweeten up these women? The purchase for flowers was not what was made at her apartment through the internet connection. That was an iTunes purchase. The flowers came two months earlier or more, and it was... To buy those flowers was also used to buy something on iTunes to Ms. Pohl's account. That's why the government contends that the purchase, the use of Ms. Ejiofor's internet to buy something from iTunes two months later provides a connection. But all it shows is that Ms. Pohl was in Ms. Ejiofor's apartment. That shows Ms. Ejiofor knew Ms. Pohl. It shows... But knowing somebody who is connected with criminal activity does not implicate the person who knows the one involved in criminal activity in that criminal activity. That is a basic principle of Fourth Amendment law. So you're saying that Ms. Pohl, should she exist, is probably involved in criminal activity? We have that kind of information? Certainly, you could have that inference because the flower purchase, which were scheme-related, and her iTunes account, the purchase to her iTunes account was made with the same debit card. And we have Ms. Pohl, should she exist, apparently in this apartment where the defendant resides? Correct. Making a non-fraud-related purchase through iTunes. Even if we say, okay, that's all true, wouldn't that be enough to support a warrant? No, that shows that Ms. Ejiofor knows Ms. Pohl. That is... And that Ms. Pohl is in Ms. Ejiofor's apartment doing things connected with a criminal scheme. Not connected with a criminal scheme. What she uses the internet for in Ms. Ejiofor's apartment, and this is critical, is only to iTunes. That is a legitimate purchase. It's not fraud-related. There's nothing fraud-related that is alleged to have occurred in Ms. Ejiofor's apartment. The link here to get a search warrant for her apartment would have to be that Ms. Ejiofor was herself involved in the criminal activity of Ms. Pohl. So we also know that Ms. Ejiofor has some connection with Mr. Zaya, because he sent her money, and we know that he has some connection with this criminal scheme. He has a connection in the sense that somebody who was determined to be in the scheme was planning to live with him, and that's what gives... Well, and he was also involved in an employment scheme, right? Another fraudulent... Right. Another fraudulent activity. Right. Okay. So we've got... But for him, for his apartment, the clearest link is that somebody involved in the scheme was going to be living at his apartment. So when the district court says, for the same reasons I found there was probable cause as to Mr. Aziz, to search Mr. Aziz's house, the probable cause there is much easier because somebody connected with the scheme was going to be living there. And that would suggest that items connected with the scheme might still be found there. Very different with Ms. Ejiofor. Didn't Zaya also give money to Ms. Ejiofor? Correct. And that shows that they knew each other. And that was, again... Well, it was a scam going on, counterfeit check and taking money out, paying her off. But... I mean, it's all just circumstantial, but it... It would rely on hunches at that point. And again, the employment scam, Mr. Aziz did not obtain the money from the employment scam until June 22nd. He transferred $500 to Ms. Ejiofor a week before that. And $200 on June 23rd. Correct. But the government has made no argument, either here or in the district court, that Ms. Ejiofor was involved in that scam. What we have here is Ms. Ejiofor's association with people either involved in criminal activity or somebody associated with somebody where somebody involved in criminal activity will be living. And knowing association with people involved in criminal activity is not a basis for searching that person's house. Before you run out of time, I'd like you to at least touch on the good faith exception under Leon. Well, the good faith here is so lacking because it's clear that all we have here is association. And association is clear under this law, cannot be the basis for the issuance of a warrant. For the executing officer, there was a presumption of validity, right? So you're thinking that the officer could look through this very long warrant affidavit and conclude from the face of it that it was wholly lacking in any support. He doesn't have to look through the whole affidavit, he has to look at those three facts relevant to Ms. Ejiofor. He doesn't have to look at the whole affidavit to pull out those facts. Correct. But we expect officers to do that, and I'll save the last five seconds. Does he have the affidavit? Does he have the affidavit, or does he just have the warrant for executing the officer? This court has clearly held that we look at, I mean, the whole Leon determination is based on what's in the warrant, in the affidavit. If the affidavit is so lacking, then the officer can't rely on the warrant. So we always assume that the agent has access to the affidavit. So we'd ask the court to reverse the suppression order, vacate Ms. Ejiofor's convictions, and remand for a new trial. Thank you. Good morning, and may it please the court, my name is Tim Ogilvie, representing the United States. I want to begin by highlighting one argument the court just heard, and it's maybe the source of the largest disagreement that the government has with Ms. Ejiofor, and that's the repeated suggestion that none of these facts link Ms. Ejiofor to criminal activity. But the purpose of a search warrant affidavit is not to identify individuals linked to crimes, but to find the link between evidence and places. And this search warrant affidavit does exactly that. And what do you rely on for that? You've got the elusive Ms. Poole charging something to iTunes on the internet address of Ms. Ejiofor, right? Your Honor, there's a couple of answers to that. I'll begin specifically with that, and then I'd like to add a little bit of context, because as Your Honor pointed out, there's more than just three facts. There's three facts in the context of the remainder of the affidavit. The defense puts a lot of emphasis on whether or not Ms. Poole is a real person. And in fact, at page seven and eight of the defendant's reply brief, she states that if Poole is a real person, it precludes Ejiofor's association with the card. And we know that's not true. It just means that perhaps there's a real Mrs. Poole in the same apartment where this card was known to have been used. Another fact that I suggest is significant. Did he not argue that, so what? I mean, if she exists and she's in the apartment, the use of the card did not have any connection to this scheme? Isn't that what he argued? He argued that that particular use of the card did not have any connection to the scheme, and that may be true, but we know for certain that that card is a tool of the trade that was used in this fraud. And the timing of the use of the card, I suggest, is more significant than what... When you say a tool of the trade, do you mean any debit card? I just mean that card in particular that she used, we already knew was used in this scam. For example, we know from paragraph 10 of the search warrant affidavit, that card was used to buy flowers twice in March and twice in April, most recently on April 27th. Then the card is used to make the iTunes purchase just three days later. So its association with this scam is pretty clearly... And it was used again for what purpose? On the 30th, that was used for the iTunes purchase. The most recent flower purchase predating that was on April 27th. And we know that this card was used in our scam because we know what victims the flowers were bought for, and those victims told the FBI, I fell victim to the Edward Duffy scam, which had facts about it that are so signature that we know that it couldn't be some unrelated scam. I suggest that the Anthony Benson connection to Mr. Azaia's house is also very critical, especially in terms of timing. We know that Benson and a person named April Cummings that he had used as a money mule were very active throughout the spring and summer of 2015. Then we know in September, Benson enters the United States and says he is going to Azaia's house. Two weeks later, he opens this account at BB&T and two weeks after that, he is now in possession of $60,000 of money belonging to a person known to have been a victim of this scam. Meanwhile, at about the same time, it is known that another tool of the trade, that being the debit card that we have been discussing, was associated with Ms. Ejifor's apartment So we have, here is information that links Azaia or his house, here is information that links Ejifor or her apartment, and then the flow of money between Azaia and Ms. Ejifor, even if it is not related to a scam, shows that they know each other. As you add each of those statements together, her participation in this scam, or more accurately, her apartment being a place where evidence of the scam might be found, becomes less and less of a coincidence. The same can be said for the cell phone analysis. I agree by itself that it does not tell a lot, but it does tell the reviewing magistrate that the rest of these facts are more likely to be true because the cell phone analysis helps support it. The cell phones used in the scam were used in close proximity to two addresses that we already think were associated with the scam. Close proximity, three miles? Well that is what Mr. Pink has said in his brief, I don't dispute that for a moment. It's true that the affidavit doesn't give any more than just the phone used in this scam by women who knew the phone number was found in close proximity to two addresses. I realize that that fact alone doesn't necessarily add a lot, and that's the reason we are cautioned to read these facts in their totality, because sometimes the sum is greater than just the total of his parts, and this is one of those times when that's very true. I might remind the court two things, two principles at issue, is first, the probable cause standard to begin with is not particularly high, and on review, this court's obligation is only to find out, did the magistrate have a substantial basis for coming to the conclusion that the court did? And I suggest reading this affidavit in its entirety answers that question in the affirmative. I mentioned also that even if we were to disagree about whether or not this affidavit set forth sufficient facts to establish probable cause, there is still a great deal from which this court could conclude that the officers acted in good faith. The whole idea behind the exclusionary rule is to prevent police misconduct, and here there was no misconduct. Agents did exactly what they were expected to do. They spent 30 pages explaining this scam to a magistrate who gave them permission to search. The probable cause is not so lacking in this affidavit that it was unreasonable for the agents to count on the magistrate's authority for the reasons that we've just discussed. So under either of those two theories, the district court's denial of these motions to suppress was correct, and that decision should be affirmed. I'm happy to field questions if there are any, and if there are none, I'm also happy to yield the balance of my time. Thank you. Thank you, Your Honors. Thank you both for your arguments this morning. The case is submitted. Our last case for argument is United States v. Morris.